KOPF *v.* MONROE STONE CO.

1. INJURIES TO SERVANT—USE OF EXPLOSIVES—ASSUMPTION OF RISK.

A servant employed in a stone quarry as a "driller," under the direction of the "loader," attempted to load a hole with

dynamite, and was injured by an explosion. The loader was
not the foreman of the work, or one whose directions the
servant was bound to obey. *Held,* that the servant assumed
the risk.

2. SAME—SUFFICIENCY OF WARNING.
    Where an employé in a stone quarry is told by the one who is
    in charge of the loading and shooting of blasts how to put
    dynamite in the holes, and is warned to be careful, the in-
    structions are sufficient, and it is not necessary that he should
    be told not to attempt to force the dynamite into a hole too
    small to admit its entrance.

3. SAME—CUSTOM—EVIDENCE.
    Testimony that the drillers in a stone quarry were accustomed
    to load holes for blasts has little tendency to prove such cus-
    tom, where the witness admits on cross-examination that this
    was done only occasionally.

4. SAME—KNOWLEDGE OF MASTER.
    Evidence that the drillers in a stone quarry, contrary to the
    orders of the master, and, so far as appears, in the absence of
    all persons in authority, occasionally loaded holes for blasts,
    is insufficient to charge the master with knowledge of such
    practice.

    MONTGOMERY and MOORE, JJ., dissenting.

Error to Monroe; Lockwood, J. Submitted January
15, 1903. (Docket No. 47.) Decided May 29, 1903.

Case by Christian Kopf against the Monroe Stone Com-
pany for personal injuries. From a judgment for plain-
tiff, defendant brings error. Reversed.

Plaintiff was employed by the defendant as a driller,
and had been so employed about eight weeks. His duty
was to drill the holes, not to load and shoot them. Seven
or eight drillers were employed. One loader, or "shooter,"
as he was called, was employed to load the holes with
dynamite and shoot them. The theory of the plaintiff's
declaration is that it was one of his duties to load the
holes, and that he was not sufficiently warned against
dangers in the use of dynamite. The theory is thus
stated in his declaration:

"Yet the said defendant, well knowing the premises, did not then and there, or any time prior thereto, instruct this plaintiff of the latent dangers of his work in relation thereto, and did not instruct and warn him that it was dangerous to push or press down upon or use force in pressing down upon such dynamite to cause the same to enter such hole or aperture, and did not instruct and warn him that such holes or apertures in the rock, if not large enough to freely admit the insertion of said dynamite against the side of such holes or apertures, was likely to cause the same to explode, and did not instruct and warn him that, by reason of such forcing or pressing down of said dynamite, the same was likely and liable to cause the explosion of the fulminating cap thereunder."

Plaintiff was employed by Lemerand, who was the foreman of the defendant, and who hired its men, including the plaintiff, and had charge of the work in the quarry.

The following facts are established:

(1) Plaintiff and the loader or shooter were fellow-servants.

(2) It was not a part of plaintiff's duty to load the holes. On the contrary, it was against the positive instructions of the defendant to its shooters and to its foreman, Lemerand.

(3) Lemerand never saw any drillers load holes, or was informed, or had any information or knowledge, that they were doing it, except in one instance, and then he severely reprimanded the man who did it, and told him to stop it.

(4) No officer of the company had any knowledge or information of any such practice, except that one of the directors, Mr. Wagner, who was secretary of the company, once had heard a rumor that the car men and some of the drillers had been using dynamite, contrary to the orders of the company. He spoke to Mr. Lemerand about it, stating that he did not want them to use it, and Mr. Lemerand said he would enforce the orders.

(5) There is no evidence showing that it is dangerous to place sticks of dynamite in a hole drilled sufficiently large to receive them.

(6) There is no evidence that any driller or loader had ever attempted before to force a stick of dynamite into a hole drilled too small.

(7) The practice, as it appears from the plaintiff's own

witnesses, was, if a hole was drilled too small, to abandon it, and drill another.

(8) There is no evidence to show that dynamite is liable to explode by pressure from the thumb or finger in pressing it into a hole of proper size, or that any similar accident had ever before occurred. On the contrary, all the evidence upon this point is that such pressure is not liable to produce an explosion.

Defendant insists that in law no case was made for submission to the jury, and requested the court to so instruct them.

*C. A. Golden (Bowen, Douglas, Whiting & Murfin,* of counsel), for appellant.

*Willis Baldwin* and *Ira G. Humphrey,* for appellee.

GRANT, J. (*after stating the facts*). 1. Plaintiff knew that he was employed as a driller; that Lemerand was the foreman who employed him, and who alone had the right to direct him. He saw Lemerand daily. He knew that Freedon was the loader and shooter, and was under the control of Lemerand; and, after Freedon was injured by an explosion, that one Poland was the loader and shooter. Freedon was injured about a month before plaintiff's injury. Plaintiff testified: "Mr. Ed. Lemerand had charge of the drilling. He was boss." He knew that Freedon had no control over him. Freedon sometimes asked him to load the last hole, and he continued to do so under Poland. Plaintiff gave no word of testimony tending to show that he supposed that Freedon had any control over him, or the right to direct what he should do. He testified:

"Ed. Lemerand, the boss of the quarry, set me drilling holes. Charles Freedon had charge of shooting these holes. He was the man under the foreman that had charge of the shooting, — drilling, loading, and shooting blasts. Freedon had charge of the loading and shooting of the holes after they were drilled. As far as I know, Mr. Ed. Lemerand had charge of the drilling. He was

boss.   *   *   *   *Freedon did not give me any orders while I was drilling there, about drilling and loading the holes. Freedon set me to work there. I was working under Lemerand, as far as I knew.* Freedon he told me to load the last holes. There were two,—one at 11:30, and another in the afternoon.   *   *   *   When Freedon asked me to load the holes, I said I did not want to load them; 'I am afraid of it.' He said the rest handled it; 'you might handle it.'"

Evidently the holes before had been large enough to receive the stick of dynamite, and there was no danger in loading such holes. He found this one too small. Upon this point his testimony is as follows:

"*Q.* You found the hole was too small?

"*A.* Yes, sir.

"*Q.* Why·didn't you leave it alone?

"*A.* I never had any warning to do anything of the kind.

"*Q.* You knew the hole was too small?

"*A.* I didn't think it would do any harm to squeeze it.   *   *   *

"*Q.* What did you do with this to get it down into the hole?

"*A.* I squeezed on this a little. It was sticking up a little, and I squeezed it. *I thought I had better let it alone.*"

Plaintiff's counsel, in their brief, say:

"It is probable knowledge, common to the ordinary man, that dynamite will explode when sufficiently jarred."

Plaintiff was familiar with the use of dynamite, and had seen it used every day for eight weeks. He had handled it before. He knew its liability to explode; that the only danger was from an explosion; that jarring is liable to cause one; and, if the hole was too small, he might have drilled another, and he thought he had better let it alone. Yet, without requirement from anybody to force this dangerous material into a hole too small, without any pretense that he had ever seen the work so done before, without any protest to his employer, or any direction from him, knowing that his employer had never seen

him do this work, and that he was not employed for that purpose, he chose to handle this dangerous material, and to force it into a hole in the rock, at the request of one who he knew had no control over his action, and no right to direct him.    One servant has no right to assume that a fellow-servant has any control over his movements, or any authority or right to direct him in his work.    It is his duty to look to the master, or his *alter ego*, for directions; and when he is employed to do one kind of work, which is entirely safe, he has no right to assume to do another kind, especially when dangerous, without the direction of his master.    Where the servant may perform his work in two ways, one safe, the other dangerous, the master is not responsible for injuries to him when he voluntarily assumes the dangerous way.    Upon the same principle, when he is employed to do work unattended with danger, he cannot make the master liable because he either occasionally or habitually chooses to do dangerous work which he knows another is assigned to do.    Under all the authorities, as I read them, he assumed the risk.    The injury was the result of his own carelessness and voluntary assumption of work he was not required to do.    It would seem to me unnecessary to cite authorities.    The following, in my judgment, sustain the proposition: Bailey, Mast. Liab. 169; *St. Louis Bolt & Iron Co.* v. *Brennan*, 20 Ill. App. 555; *Brown* v. *Byroads*, 47 Ind. 435; *Knox* v. *Coal Co.*, 90 Tenn. 546 (18 S. W. 255); *Lindstrand* v. *Lumber Co.*, 65 Mich. 254 (32 N. W. 427).    The language of Mr. Justice CAMPBELL in the last case is applicable here:

"Mill owners cannot be supposed to anticipate that laborers in other work about the mill will handle the saws, or assume that any such direction as was given in this case was meant to give any such discretion.    Plaintiff does not testify that he supposed the foreman required him to run any such risk.    Had such orders [for a laborer to use a circular saw] been given, they would not have justified him in doing what he did."

The law does not impose upon the master the duty to

warn or instruct his servant in regard to work he is neither employed nor required to do.

2. Assuming that defendant knew that plaintiff was engaged in loading holes, what notice should have been given to him other than was given? Plaintiff testified that Mr. Freedon told him how to do the work. Freedon testified that he did give plaintiff dynamite to load some holes with, and explained the circumstances. "He was drilling three big stones in front of the car. The car men would have had to lie idle if I had not left dynamite." He testified that the car men insisted upon his leaving it for the hole, and he did so. He testified: "I told Kopf how to fix it; how it would be safe, also told him to be careful." We must assume, therefore, that he instructed him as to the method which Mr. Freedon safely pursued. If this was so, the instructions were sufficient. The most competent man, undoubtedly, to instruct the plaintiff, was Mr. Freedon. Was defendant or Freedon bound to anticipate that plaintiff would attempt to force this dangerous explosive into a hole too small, and to warn him not to do it? Common sense would teach any reasonable man better than to do that. It requires a jar to explode this material, and there is certainly danger of a jar in forcing a stick of dynamite into a hole too small. Whatever danger there was in that was as apparent to plaintiff as to any employé of the defendant. If the dynamite had exploded in consequence of plaintiff's attempt to drive it in with a stone, would it have been the duty of the defendant to anticipate this, and warn him that it was dangerous to strike it with a stone? The only witness to the transaction, aside from plaintiff himself, is another employé, who testified that plaintiff did strike it with a stone, and he was about to speak to him when the explosion occurred. Plaintiff saw Freedon and Poland load holes, and he does not pretend that he ever saw either do what he (plaintiff) did at the time of the accident. The law does not permit plaintiff to say, under these circumstances, that he was not properly instructed, or that defendant should have

given him more specific instructions as to the dangerous character of dynamite. He knew the terrible consequences of an explosion. He knew that a jar was the cause of explosions. A warning to that effect would have been useless. See *Benfield* v. *Oil Co.*, 75 Hun, 209 (27 N. Y. Supp. 16). I do not think that this is a case for the application of the doctrine in *Smith* v. *Car Works*, 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542), and *Ribich* v. *Smelting Co.*, 123 Mich. 401 (82 N. W. 279, 48 L. R. A. 649, 81 Am. St. Rep. 215). It is a case where the servant knew the danger, was familiar with the causes of explosions, and needed no warning.

3. It must be conceded that plaintiff was acting outside the bounds of his employment, and that none of the *alter egos* of the defendant had any actual notice or knowledge that he was loading holes. The sole ground for charging liability is that this work had been done so long, and so openly and notoriously, that knowledge on the part of the defendant is to be presumed. This leads necessarily to the statement of the testimony upon this point. Unless there was sufficient evidence to in the law charge the defendant with knowledge, the judgment cannot be sustained.

It will be readily understood that the leaving of a stick of dynamite with the drillers for the last hole, and the putting of the same in the hole by the drillers, is not a transaction of so large proportions as to attract attention. It is apparent that this might be done day after day without Mr. Lemerand or any officer of the company knowing it. One of plaintiff's own witnesses, a driller, testified that he knew it was no part of his business to load, but did it. "I knew that there was a man there to do that work, and that it was no part of mine to do that." The quarry covers five or six acres, and any officer might stand around the edge of the quarry, or walk through it every day, without knowing that its orders in this respect were being violated. The holes were loaded twice a day,— about 11:30, and again when they quit work in the after-

noon. Sometimes there was a third blast, in the morning. These are not times when the *alter egos* of the company were apt to be around the drilling places in the quarry. Immediately upon the holes being loaded, the whistle blew to get out of danger. Naturally those whose duty did not take them there would get out of the way at about blast time. Plaintiff testified:

" He [Lemerand] was not around any time when I was loading these holes; not that I know of. He was not around. * * * I did not see him anywhere when I loaded holes. He never saw me load holes at any time during the two months I was there."

He does not testify that he saw any other officer of the company there at those times.

One William W. Smith, a witness for plaintiff, testified that he had seen men drilling and seen men load holes, but he never saw a driller load holes. His business was loading cars in the quarry, where the drilling and loading were going on.

One Louis Burns also testified that he had seen drillers load holes; that he had been working there about seven months; that the drillers were loading holes right along, until plaintiff got hurt. On cross-examination he testified:

"When Freedon was hurt, I supposed Poland was hired to take his place. He left some [dynamite] for the drillers when it came close to shooting time. He left some for Jim Durocher; I suppose he did. I saw him do that once or twice. He left some for Jim Benore one day when I was drilling in the hole. Freedon did that. I saw him do it once or twice. Sometimes I worked in the hole for a half day, sometimes for only two or three hours. Freedon left dynamite to the drillers once or twice in the fall of the year 1900. I cannot swear that the dynamiter left dynamite for any more of the drillers to load the holes with."

One Deerbeck, another driller, said that he had worked there as a driller.

"I only loaded a few holes, two or three, up to the time Kopf was hurt,—battery shots."

He saw other drillers load holes right along until some-body got hurt.   On cross-examination he testified that he worked there about three summers, that Freedon was dynamiter when he left, and that all the loading he did was to help Freedon when Freedon asked him to.   He said:

"I did not try to do it [load] when I was alone.   I loaded one myself.   I did it for fun.   I was doing car work then, and had nothing to do with drilling holes."

On redirect examination this same witness testified that he saw other drillers load holes besides those he had men-tioned.

"I drilled some of the holes myself, and loaded them myself.   Freedon left the dynamite for me.   I didn't pay any attention as to whether he left dynamite for others. When he left the dynamite for me he went around.   I was not quite done with my hole.   I could not tell who loaded the last holes if they were not completed when the shooter came around with the dynamite.   If the hole was not completed, the shooter would not load them then.   It was loaded the next time it was shot.   There were several drillers, and each one drilled so many holes.   Freedon came around with the dynamite.   The last one before they got ready to shoot, if it was not completed, they would wait until the next time.   *   *   *
"*Q*. Did the drillers ever load the last holes?
"*A*. Yes, sir; they would load them themselves some-times; sometimes they would not.   It was according to how the hole was.   If it was deep enough, they would load it; if not, they would not."

One Edward Zeller, a car man, testified:

"It happened occasionally that the drillers loaded holes. They left the dynamite for the drillers to load holes just before quarter time, noon, and afternoon.   I do not know how long that continued before Kopf got hurt.   I worked there from the 5th or 6th of July until the week before they shut down.   That was after Kopf got hurt.   During all of that time the drillers did not do any loading that I know of.   I paid no attention to what went on back of us.
"*Q*. You saw them load holes?

"*A.* Sometimes I went with the driller. I requested dynamite to be left. I cannot tell when that was. It was early in the summer. To my knowledge I do not know of other cases of their leaving dynamite. I didn't pay any attention to the other cars. * * * When they distributed it they loaded every hole that was drilled. If there was a hole that was not finished, we requested him to leave, providing we were sure we could get the hole deep enough, and he would leave the dynamite.

" *Q.* The man that was drilling would load the holes?

"*A.* It only happened several times while I was there. I always loaded them myself. I have seen others load them."

On cross-examination he testified:

" I loaded them myself. Only a few times I loaded the holes. I was not a driller. I was working by the car. Two men would go as partners, and were paid by the car. That is what I was doing. In order to get stone, I would load the hole myself. That was an everyday occurrence in the forepart of the summer of that year. I told the dynamiter that I wanted him to leave the dynamite to shoot the holes the drillers were working at."

This witness worked there about six months previous to the accident.

One Joe Bellcover also testified that he had loaded holes; that nothing was said to him in reference to it.

"I understood that it was none of my business as a driller to load these holes, but I did it. I knew there was a man there to do that work, and that it was no part of mine to do it. I understood it was no part of my work; I understood that all right enough. I think I saw Kopf load two holes. I saw Louis Couture, a driller, load holes. Pretty nearly every time he was not through with a hole when the dynamite was left."

This is all the testimony on the part of the plaintiff to show a practice so open and notorious as to charge the defendant with knowledge of it, and consequent ratification. The testimony of a witness is no stronger than it is made by his cross-examination. Where a witness testifies that the drillers were accustomed to load holes, and he

testifies upon cross-examination that it was done only occasionally, such testimony is of but little probative force to prove a custom. But, giving the testimony of these witnesses its greatest force, we find that only when a driller had his last hole so nearly completed that it was suitable for loading did the loader leave with him a stick of dynamite for the purpose of loading, and that the unfinished holes were left to be finished after the blast. All the others were loaded by the regular loader, the man specially employed and qualified for that purpose. Furthermore, it nowhere appears from the testimony of any of these witnesses that on any occasion was Lemerand, the foreman, or any other officer of the company, within sight, or that any such officer saw it, or was in position to see it. Plaintiff's own witness Smith (one upon whom he specially relied), whose business was right in the quarry where these holes were drilled and loaded, testified that he did not know of any such custom, and never saw a single driller load any of the holes. Yet the learned counsel insist that Lemerand and the other officers of the defendant should have seen, and did see, what Mr. Smith did not see. The evidence of those who managed the affairs of the company, and whose duties more or less frequently took them to the quarry, is that they did not see it; that they had no knowledge of it; and once acted promptly upon a rumor that it was occasionally being done. Mr. Lemerand testified that, during the seven years of his superintendency, he saw only one man, named Couture, doing it, and told him to stop it. He also testified that he told plaintiff not to handle dynamite. This statement is not denied. He also testified that after the loader, Freedon, was injured, notices were posted in the quarry prohibiting the handling of dynamite by any but the loaders. The only statement in contradiction of this is the testimony of plaintiff that he did not see them.

Mr. Freedon testified that on the occasions when he asked plaintiff to load the hole, and showed him how, "Lemerand was not around there. If he had been, I

would not have done it, because he would have given me the devil for it." Frank Poland testified:

"The men who were employed to do the drilling had nothing to do with the dynamite, except, as far as I could see, if the hole was not loaded, they wanted to load to accommodate the car men; they wanted us to leave it to put it in. That did not happen often; very seldom. I never did that when the foreman was around, as it was against orders for anybody to handle dynamite except me. I never told Kopf to load holes. I never saw him load a hole. I never knew of him loading a hole."

Just before the blast it was the duty of the loader to go to the magazine, procure the dynamite, and proceed at once to load the holes. There was no variation from this custom. It evidently took but a short time. The stick of dynamite was from 4 to 6 inches long, and the last stick was placed in the hole just before the blast. The time of the blasts was well known. There is not a scintilla of evidence in the case to show that any *alter ego* of the defendant was present or in the immediate vicinity when this act of loading by any of the drillers or car men was done. Not one testified that he considered it a part of his duty. Only one testified that he was ignorant of orders against it.

This is not, in my judgment, a case for the application of the rule that knowledge and ratification of a practice may be implied from its open and notorious character. All these drillers who loaded holes, including the plaintiff, knew that it was not a part of their duty to do it. They knew that the loader had no control over them. One says he did it for fun. All did it voluntarily, evidently for the convenience and accommodation of themselves and the loader. They did it without asking the defendant's permission to do so, and one of them now seeks to fasten a burdensome liability upon the defendant by saying: "You ought to have known I was doing it, and either prohibited me from doing it, or warned me of the dangerous character of dynamite." If the defendant is, upon

this record liable to the drillers, it is also liable to the car men, who sometimes loaded the holes. This is not a case of defective machinery, where the defect is exposed to view, and can readily be detected; nor the case of an employé of a railroad company, who openly and notoriously violates the rules of his company in the presence of its *alter egos*. Neither is it a case where any duty of inspection is involved. It was, in my opinion, incumbent upon the plaintiff to show that some of the officers of the defendant, who were its *alter egos*, were present and in position to see and know that he and other drillers were in the habit of loading the last hole. It is not, I think, a reasonable inference that any such officer of the defendant saw or heard of the practice which they had been so careful to guard against. Neither ought it, in my judgment, to be held that they should have known it, and that, in consequence, there was constructive notice of the custom.

The judgment is reversed, and new trial ordered.

HOOKER, C. J., and CARPENTER, J., concurred with GRANT, J.

MONTGOMERY, J. (*dissenting*). Plaintiff, who was an employé of the defendant, was injured by a premature explosion of dynamite, caused by his attempting to stick a piece of dynamite in a hole in the rock too small for the stick. The facts of the case, briefly stated, are that the defendant was engaged in quarrying stone, using dynamite for blasting. The work was under the immediate charge of one Lemerand, a foreman. The plaintiff was engaged in drilling the holes to receive the sticks of dynamite. When plaintiff first commenced his work, the dynamite was in charge of one Freedon, called a "shooter," whose duty it was to place the dynamite in holes previously prepared for the purpose at stated times during the day. The testimony on the part of the plaintiff tended to show that when he commenced work, some two months prior to the injury, he was instructed by Freedon to place a stick of dynamite in the holes last prepared by him before the

shooting. The practice, as he testified to it, was this: Freedon would at a time near noon, or just preceding a blast, bring around dynamite, and place the sticks in such holes as were then completed, and at the same time leave with the drillers sticks of dynamite to be placed in additional holes when completed. After a time, Freedon was injured, and one Poland took his place. No additional instructions were given to the plaintiff by Poland, but plaintiff testifies that the dynamite was still left with him, and the practice continued. There was other testimony tending to show that the practice among the shooters was to leave dynamite with the drillers in the manner stated, and that this practice extended over a period, according to the testimony of one witness, of seven months prior to the injury. The plaintiff's testimony tended to show that he knew that dynamite was dangerous, but that he did not know of the peculiar danger of pressing the dynamite into a hole; that he never was warned of this danger; that, on the occasion in question, he pressed the dynamite with his thumb into the hole, and that it exploded, causing the injury. The defendant's testimony tended to show that an explosion could not be caused by such a use of the dynamite as plaintiff testified to. But we think this, under the testimony in the case, was fairly a question for the jury.

It is contended by the defendant, first, that from the knowledge it had, which did not include any positive information or knowledge that dynamite would explode under the circumstances stated, it was not the duty of the defendant to warn the plaintiff of such danger. The contention seems to be that it was the duty of the defendant to warn the plaintiff of such dangers as it had, from its experience or otherwise, acquired a knowledge of. But we think this states the rule too narrowly. We think at least the rule should be that, where a substance of this character is being used, the defendant is bound to warn its employés of such dangers as it knows of, or might by proper investigation have informed itself of; that want of knowledge on the part of the employer is not conclusively

an excuse for the failure to give warning. We think, under the rule previously laid down by this court in *Smith v. Car Works*, 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542), and *Ribich v. Smelting Co.*, 123 Mich. 401 (82 N. W. 279, 48 L. R. A. 649, 81 Am. St. Rep. 215), that it was the duty of the defendant to give warning of any peculiar danger which the defendant knew of, or which, having regard to the character of the substance employed, reasonable care and prudence should have acquainted it with.

It is contended, also, that the plaintiff was guilty of contributory negligence; but whether he was or not depends upon whether he was bound to have a knowledge of the danger of which he had not been warned, and of which the defendant, by the testimony offered, appears not to have been itself informed. We think that the evidence upon this branch presented a question for the jury.

But it is contended, further, that the shooter who ordered plaintiff to load the hole was not acting within the scope of his authority, and that the work which the plaintiff assumed to do was voluntarily assumed. Upon this branch of the case the learned circuit judge charged the jury as follows:

"If the jury find from the evidence in this case that the person in charge of the blasting, known as the 'shooter,' did direct the plaintiff to charge these holes, and that the plaintiff and the other drillers, acting in good faith and openly, believing such work to be in the line of their duty, did charge these holes for a period sufficiently long so that the defendant, by the exercise of ordinary care and prudence, should have discovered that the drillers and the plaintiff were charging the holes themselves, then the work of charging the holes with dynamite by the plaintiff will be deemed to have been done with the approval and under the direction of the defendant, and the defendant was then in duty bound to have warned the plaintiff of any latent and hidden dangers of his work."

We think this charge fairly presented this question to the jury. *Chicago, etc., R. Co.* v. *Bayfield*, 37

Mich. 212; *Jones* v. *Railway Co.*, 49 Mich. 573 (14 N. W. 551); *Walker* v. *Railway Co.*, 104 Mich. 606 (62 N. W. 1032). It is true the testimony on the part of the defendant tends to negative any knowledge on the part of the foreman that the drillers were making use of dynamite, but as against this there is the evidence that the foreman's duties required his presence at this work every day; that he was all about the premises; and there is testimony strongly tending to show that the practice of the drillers of placing dynamite as above stated was continued for a period of seven months. If this be true, it certainly raised a question of fact for the jury as to whether the company did not, through its foreman, have actual knowledge that this practice was indulged.

The only questions discussed in the original brief of appellant are those which relate to the defendant's claim that a verdict should have been directed in its behalf. There is no complaint made that, if there is a case for the jury, it was not properly submitted. The inference is that defendant is satisfied that the verdict should stand, unless the court shall determine, as a matter of law, that a verdict should have been directed. We think there was a case which entitled the plaintiff to go to the jury, and the judgment should be affirmed, with costs.

MOORE, J., concurred with MONTGOMERY, J.