## KOPF *v.* MONROE STONE CO.

MASTER AND SERVANT — INJURIES TO SERVANT — NEGLIGENCE — EVIDENCE—QUESTION FOR JURY.

In an action for injuries to a servant by the premature explosion of dynamite in a quarry, evidence examined, and *held,* to require submission of the issue of defendant's negligence in failing to instruct plaintiff of the danger of the work to the jury.    GRANT and OSTRANDER, JJ., dissenting on the ground that plaintiff, by voluntarily assuming to perform duties not required of him, assumed the risk.

Error to Monroe; Lockwood, J.    Submitted January 6, 1905.    (Docket No. 22.)    Decided July 21, 1905.

Case by Christ Kopf against the Monroe Stone Company for personal injuries.    There was judgment for plaintiff, and defendant brings error.    Affirmed.

*Bowen, Douglas, Whiting & Murfin,* for appellant.

*Willis Baldwin* and *Ira G. Humphrey,* for appellee.

MOORE, C. J.    This case has been here before, and is reported in 133 Mich. 286.    A reading of the opinions

then filed will do away with the need of making a long statement here. Upon the second trial, plaintiff recovered a verdict. The defendant brings the case here by writ of error. After the second trial a motion was made for a new trial. The trial judge filed in writing his reasons for refusing this motion. As they state clearly some of the questions involved, we quote in part from them:

" The defendant's counsel in the argument of this motion did not urge any of the reasons assigned, except that the court should have taken the case from the jury and directed a verdict for the defendant. * * * I am aware that upon the hearing of this case in the Supreme Court the majority of that court were of the opinion that there was no testimony to submit to a jury tending to show that the shooter had authority to direct plaintiff to load holes; that there was no evidence of a custom on the part of the drillers to load holes, sufficient to charge the defendant with notice thereof, or to make the defendant in duty bound to warn plaintiff of latent dangers incident to the use of dynamite in loading holes. The evidence upon these points was very complete upon this trial. Admitting that there is a conflict in the evidence, because the officers of the defendant and its foreman denied knowledge of such custom, still it cannot be said that there is no evidence tending to show the authority of the shooters to direct drillers to load these holes, or of a long, continuous, and notorious custom among all the drillers employed in this quarry to load holes with dynamite, and to do this upon the orders of the shooters. The testimony shows that for a period of about seven years the custom has prevailed in this quarry for the shooter to furnish dynamite to the drillers to load the last hole at shooting time, and to order them to load their holes when finished, and for the drillers, in compliance with these orders, to load these holes. The shooting occurred four times a day—at half past nine, at twelve, at half past three, and at six, spoken of as quarter time. There is the evidence of several witnesses showing the defendant's general foreman had actual knowledge of the loading of these holes by the drillers, and on some occasions assisted the drillers in so doing. When it is remembered that this work is done in a large open pit, covering from two to three acres of ground, that all or nearly all parts of this pit were open to view from any point on

the banks, and that this practice had continued for a period of about seven years, and that the loading by drillers occurred every day and usually by many drillers each day, it must be conceded that this custom was open and notorious; and it is hard to conceive how it could have continued without the knowledge, consent, and acquiescence of the men in charge of the quarry.

"It seems to me that there was abundant proof to submit to the jury upon the question of this custom, and upon the question of the authority of the shooter to direct the drillers to load these holes. In my judgment, this question was fairly submitted to the jury in the charge given.

" I think that the testimony in this case clearly shows that the liability of dynamite to explode by friction, or of dynamite being exploded by pressing the stick into a hole, was a latent danger incident to the use of dynamite in the loading of holes; that this liability to explode from friction is known to those familiar with the use of dynamite. Mr. Sundstrum, who has a scientific as well as a practical knowledge of the subject, explains this very clearly in his testimony; and the witnesses Navarre and Sharkey, and in fact all those who had special acquaintance with the use of dynamite, admit that it is dangerous to press it into a hole which is too small. I think that the court would not be justified in holding, as a matter of law, that this was a danger of which the plaintiff, a common laborer, was bound to know; and it seems to me that the contention that the defendant is not liable in this case, because the plaintiff pressed the dynamite into a hole too small for it, when he had not been specifically told to do this, has no merit in it, for catastrophies of this kind never would occur if no one did an imprudent thing.    It is the lack of knowledge of the danger that explains the plaintiff's conduct.    The rule that the employer should warn his servant of the latent dangers could have no possible application if the employer was only required to perform the particular work once in the presence of the employé, and was then permitted to say that the least variation from the method was an assumption of risk by the laborer.   *   *   *

" It is contended that the defendant was not bound to anticipate that the plaintiff would attempt to force a dynamite cartridge into a hole that was too small to receive it. In view of the testimony of Mr. Sundstrum and of the other experts produced by the plaintiff as well as by the

defendant, I do not think that the court can hold, as a matter of law, that defendant was not bound to anticipate just what occurred according to plaintiff's testimony in this case. The holes were drilled, when the drills were perfect, only large enough to admit the dynamite. There is abundant testimony showing that the bits of the drills constantly wear away, thus making the holes too small. There is testimony tending to show that it was frequently found necessary by those handling dynamite to break up the cartridges in order to get them into the holes, and by so doing avoid the friction incident to pressing the cartridge into the hole.

" The testimony upon this trial of this case is very much fuller on all these points than it was upon the former trial.

" In fact, upon many of these points at the former trial there was very little, and, according to the opinion of the majority of the Supreme Court, no evidence whatever, in favor of the plaintiff's contention. It seems to me that upon this trial there is evidence in support of the plaintiff's theory on all these points."

In this connection it may be well to quote from the testimony of Mr. Sundstrum, who was not a witness in the other trial:

" I am general manager of the Sibley Quarry Company, and am 52. I am a graduate of Royal Polytechnic, Stockholm, as a chemical and mechanical engineer. From that time, in 1873, I have been for 16 years engaged in the dynamite manufacturing business, until I changed to another branch of the business. Since that time I have been upon a commission to investigate dynamite and its qualities on three different commissions. * * * I was engaged in the manufacture of dynamite from 1873 to 1884. Have built five dynamite factories. * * * I have used thousands and thousands of pounds. I was general manager of the Forsyth Powder Company, that made nearly every pound of dynamite used in the New York Aqueduct. Have full chemical knowledge of dynamite, and have had charge of a good many men using dynamite.

" Q. In this case the testimony will show that they were using what is called 'Hercules Powder,' with 40% or 60% dynamite. It will show where the accident occurred the hole was small in diameter (the hole was in the rock),

and that the driller (the man who was injured) had taken a piece of fuse, with the cap on the end of it, and had put this fuse, with the cap on the end, down into this hole, which was five or six inches deep, and that he had then taken up a stick of this dynamite (Hercules powder) and attempted to put it into this hole. The hole was a little small for it. He pressed slightly upon it to get the stick two or three inches down in the hole, when it exploded. From your knowledge of dynamite and its use, I would ask you whether that was a reasonably safe thing for this man to do?

" *A.* I must first repeat, so that I understand it. You said: Take a piece of fuse and put on a cap. You put the fuse in the cap. After that the fuse and cap was put down in the bottom of the hole. After that was there he took a dynamite cartridge and pressed it into the hole. It was a little too small. He forced it down. Is that the language?

" *Q.* Put his thumb on top.

" *A.* And pressed it down. I must ask one question? Was the dynamite frozen, or not?

" *Q.* The testimony shows that the dynamite was frozen.

" *A.* You ask my present opinion. It is most terribly reckless to put dynamite in and push it in. Every time it is done it is only good luck that an explosion does not take place.

" *Q.* What would likely cause the explosion under such circumstances?

" *A.* One is that the cap is not properly fastened to the fuse— The dynamite being too small, even if it had not been frozen it will take hold of the fuse and push it down. It is sensitive, and it will explode the dynamite under these circumstances. If the dynamite is frozen it will be still harder—the explosion easier. I have seen a dynamite cartridge that is frozen exploded by a stick of wood. There was no cap or fuse on it. When the cap and fuse is on it, it is more dangerous.

" *Q.* If I understand you rightly, if the cap and fuse were at the bottom of the hole, and you took a stick of dynamite and pressed down on it, it pressed the fuse against the fulminate matter?

"*A.* Yes, sir. Against the fulminate, and it makes it explode. The hard friction is enough between the side of

the hole and the frozen dynamite—is enough to cause the explosion.

"*Q.* I would ask you if these matters which you have just told us are matters of common scientific knowledge?

"*A.* Very common.

"*Q.* Is this knowledge of these facts which you have stated necessary to the safe use of dynamite by any person?  *  *  *

"*A.* I deem it so, and it is only good luck that no explosion has ever happened—that is all.  *  *  *  The custom in other quarries is to use a hole that is large enough, so that the dynamite goes very easy down. It is the custom in other places where they use dynamite to only allow certain men, well instructed, to use dynamite, and no others. As to those men who use dynamite, it is the custom to tell them about the danger of frozen dynamite, and instruct them exactly how every shot should be loaded. They are told that the hole should be at least one-quarter of an inch larger in diameter than the cartridge —allow one-eighth of an inch on each side. We never put the fuse down alongside the dynamite cartridge. I would discharge the man who did. The proper method of loading holes for pop shots is to take a small piece of cartridge, looking that it is thawed out so that it is soft, make a little hole in the center of the cartridge with a pin, put a cap or fuse with a cap well pinched together with the fuse, put the cap with the fuse into this hole in the cartridge, with a piece of paper with a string, and sink the whole thing into the hole, and fill the rest of the hole with sand. The cap on the top of the cartridge, the other way, I regard as a dangerous way to load holes."

If this testimony is true, it shows that the manner of putting the dynamite into the hole as shown to the plaintiff was not the best method, but was a dangerous method. It also shows defendant should have known the extreme danger of using frozen dynamite where friction was likely to be generated, and should have warned any employé whose duty it was to use it of this danger.

There was much testimony in this case, not in the other trial, in relation to the custom of the drillers loading the last hole, and also of the knowledge the foreman had of that fact. Ben Lavoy testified he was a driller, and load-

ed the last holes, thinking it was his duty to do so. We quote:

"Lemerand was foreman while I was there. He was the only foreman when I was working there. Sometimes he was in the quarry, sometimes on the bank, sometimes on the crusher, sometimes in the blacksmith shop. I guess he had entire charge inside and outside.

"Q. Did he ever see you when you loaded holes?

"A. Yes, sir; he handed me a shovelful of dirt to help pour in. I asked him if he would give me a shovelful and help fill it. He did so."

It would profit no one to set out the different and additional testimony introduced upon the second trial. We think it, however, very clear the trial judge was right in saying a very different case was presented, and one which it was his duty to submit to the jury. This he did very fully and carefully.

Judgment is affirmed.

Carpenter, McAlvay, Blair, and Montgomery, JJ., concurred with Moore, C. J.

Grant, J. (*dissenting*). This case is now before us a second time. See 133 Mich. 286. An extended statement of facts is unnecessary. For that we refer to the former opinion. For three reasons we then held that the plaintiff had not established a cause of action, and that the court should have directed a verdict for the defendant. If the present record as to any one of these reasons is substantially the same as that upon the former trial, the judgment is, of course, erroneous.

The first reason for reversing the judgment before was that the plaintiff voluntarily assumed to do work which he was neither employed nor required to do, and that therefore he assumed the risk. Upon this point we said:

"Plaintiff knew that he was employed as a driller; that Lemerand was the foreman who employed him, and who alone had the right to direct him. He saw Lemerand daily. He knew that Freedon was the loader and shooter, and was under control of Lemerand, and, after Freedon

was injured by an explosion, that one Poland was the loader and shooter. Freedon was injured about a month before plaintiff's injury. Plaintiff testified: 'Mr. Ed. Lemerand had charge of the drilling. He was boss.' He knew that Freedon had no control over him. Freedon sometimes asked him to load the last hole, and he continued to do so under Poland. Plaintiff gave no word of testimony tending to show that he supposed that Freedon had any control over him, or the right to direct what he should do. He testified:

" ' Ed. Lemerand, the boss of the quarry, set me drilling holes. Charles Freedon had charge of shooting these holes. He was the man under the foreman that had charge of the shooting—drilling, loading, and shooting blasts. Freedon had charge of the loading and shooting of the holes after they were drilled. As far as I know, Mr. Ed. Lemerand had charge of the drilling. He was boss. * * * Freedon did not give me any orders while I was drilling there about drilling and loading the holes. Freedon set me to work there. I was working under Lemerand, as far as I knew. Freedon, he told me to load the last holes. There were two—one at 11:30, and another in the afternoon. * * * When Freedon asked me to load the holes, I said I did not want to load them; " I am afraid of it." He said: ." The rest handled it. You might handle it." ' "

"Evidently the holes before had been large enough to receive the stick of dynamite, and there was no danger in loading such holes. He found this one too small. Upon this point his testimony is as follows:

" ' Q. You found the hole was too small ?
" 'A. Yes, sir.
" ' Q. Why didn't you leave it alone ?
" 'A. I never had any warning to do anything of the kind.
" ' Q. You knew the hole was too small ?
" 'A. I didn't think it would do any harm to squeeze it.
" ' Q. What did you do with this to get it down into the hole ?
" 'A. I squeezed on this a little. It was sticking up a little, and I squeezed it. I thought I had better let it alone.'

" Plaintiff's counsel, in their brief, say :

" ' It is probable knowledge, common to the ordinary man, that dynamite will explode when sufficiently jarred.'

" Plaintiff was familiar with the use of dynamite, and he had seen it used every day for eight weeks. He had handled it before. He knew its liability to explode; that

the only danger was from an explosion; that jarring is liable to cause one; and if the hole was too small he might have drilled another;  *  *  *  yet, without requirement from anybody to force this dangerous material into a hole too small, without any pretense that he had ever seen the work so done before, without any protest to his employer or any direction from him, knowing that his employer had never seen him do this work, and that he was not employed for that purpose, he chose to handle this dangerous material, and to force it into a hole in the rock, at the request of one whom he knew had no control over his action and no right to direct him.   One servant has no right to assume that a fellow-servant has any control over his movements, or any authority or right to direct him in his work.   It is his duty to look to the master or his alter ego for directions, and when he is employed to do one kind of work, which is entirely safe, he has no right to assume to do another kind, especially when dangerous, without the direction of his master.   Where the servant may perform this work in two ways, one safe, the other dangerous, the master is not responsible for injuries to him when he voluntarily assumes the dangerous way. Upon the same principle, when he is employed to do work unattended with danger, he cannot make the master liable because he either occasionally or habitually chooses to do dangerous work which he knows another is assigned to do.   Under all the authorities, as I read them, he assumed the risk.   The injury was the result of his own carelessness and voluntary assumption of work he was not required to do.   It would seem to me unnecessary to cite authorities.   The following, in my judgment, sustain the proposition:   Bailey on Master's Liability, p. 169; *St. Louis Bolt & Iron Co.* v. *Brennan*, 20 Ill. App. 555; *Brown* v. *Byroads*, 47 Ind. 435; *Knox* v. *Coal Co.*, 90 Tenn. 546; *Lindstrand* v. *Lumber Co.*, 65 Mich. 254.   The language of Mr. Justice CAMPBELL in the last case is applicable here:

" 'Mill owners cannot be supposed to anticipate that laborers in other work about the mill will handle the saws, or assume that any such direction as was given in this case was meant to give any such direction.   Plaintiff does not testify that he supposed the foreman required him to run any such risk.   Had such orders [for a laborer to use a circular saw] been given, they would not have justified him in doing what he did.'

140 Mich.—42.

"The law does not impose upon the master the duty to warn or instruct his servant in regard to work he is neither employed nor required to do."

Upon this branch of the case the testimony of plaintiff is substantially the same as before. He does not testify that he had ever seen a stick of dynamite forced into a hole too small. He testified that he had seen the loaders load holes, when the stick was too small, by breaking it up. He testified that at the time of this accident one Robert took a stick of dynamite too large to go in a hole, and that Robert, "when he found the hole was too small, did not try to force it in, but laid it there." This occurred at the same time the plaintiff was injured. In regard to this transaction, Mr. Robert was present when Kopf got hurt, and testified:

"I was pushing the car towards Kopf. When I heard the report I was behind the car, about 150 or 100 feet away. Before the explosion my partner went to dinner. I took the car to the incline. I went up and got my coat and vest. There was a stone on the end of my track, about 20 inches or 2 feet thick, that was loaded. There was a hole in the stone, and the fuse was coming out of it. It must have been on top. There was, I suppose, about 4 or 5 inches to fill that up. The candle was in the bottom. I seen an old pail. There was a piece of dynamite about 4 or 5 inches long in it. I took the piece. That piece of dynamite was in an old pail. I took the piece and tried it over that hole that was loaded. It wouldn't fit in. Kopf said, 'Will it go in?' I said, 'No.' He said, 'What is the matter? Doesn't it go in?' I said, 'No; it is too big.' 'Are you afraid?' I said, 'Yes. I will not try to put it in.' I didn't want to monkey with it. He said, 'I can put it in.' I asked, was it full? He said, 'I am going to fill up this hole.' He said that. He said, 'I will put it in.' I took my vest and walked away. I walked away to the man pushing a car away from another man that wanted to get in with a loaded car. I hadn't been gone but 10 or 15 feet when I heard a noise."

This testimony is not denied by the plaintiff. In this connection I quote further from plaintiff's testimony:

" *Q.* Why did you want to put a piece of dynamite in a hole that was too small for it ?   What did you do that for ?

"*A.* Because I thought I would fill the hole.

" *Q.* Had you ever done it before?

"*A.* Yes, sir.

" *Q.* Put a big piece of dynamite in a small hole ?

"*A.* Yes, sir.

" *Q.* Didn't you think you had better let it alone, when you found it was sticking out of the hole ?

"*A.* I squeezed on it a little, and it went.

" *Q.* You thought before that that you had better let it alone ?

"*A.* Yes, sir.

" *Q.* Don't you remember—

"*A.* I thought I would squeeze it down a little.  I hardly thought that; then it went.

" *Q.* Didn't you think you had better not do that ?

"*A.* Yes, sir.

" *Q.* What were you thinking of ?

"*A.* I didn't have my thought done until it went off.

" *Q.* You thought you had better let it alone, and, before you could take your hand off, it exploded ?

"*A.* Yes, sir.

" *Q.* Why did you think you had better let it alone ? Did you think it might blow up if you pressed on it ?

"*A.* I thought it might blow up.   *   *   *

" *Q.* When you went to put the old stick in the other hole, what did you think you ought to leave it alone for ?   You did think you ought to leave it alone ?

"*A.* Yes, sir.

· " *Q.* Did you think that ?

"*A.* Yes, sir; I didn't have my think done when it went.   *   *   *

" *Q.* Why didn't you leave it alone.   It didn't make any more money for you to load it ?

"*A.* No, sir.

" *Q.* You would not get any more money ?

"*A.* No, sir.

" *Q.* You would get your pay just the same for a day's work if you left it alone?

"*A.* Yes, sir.

" *Q.* You wasn't hired to do it ?

"*A.* I worked under Freedon's instruction.

" *Q.* You wasn't hired to do that work ?

"*A.* I worked under Freedon's instruction.

" *Q.* You would have got just as much pay if you didn't do it ?   No one told you to load that hole ?

"*A.* No, sir; they did not; but I worked under Freedon's instruction.

" *Q.* Was there anybody there—when you found that hole too small was there anybody there that told you to load it ?

"*A.* No, sir.   Freedon said he didn't leave the stick of dynamite for me; he did—the same piece I put in the hole.

" *Q.* Was there anybody there that told you to do it ?

"*A.* No, sir.

" *Q.* When you found the hole was too small, you did it because you wanted to do it ?   Is that the only reason— you tried to do it because you wanted to ?

"*A.* I didn't know what danger there was.

" *Q.* Was there any reason in the world why you tried to load it if you found the hole too small, except that you wanted to try it ?

"*A.* I thought I would load it.

" *Q.* You thought you would load it?

"*A.* Yes, sir.

" *Q.* That is the only reason ?

"*A.* Yes, sir."

Under such a record, for the reasons stated in the former opinion, I am unable to hold that there is either law or justice to sustain the judgment; and I think it should be reversed, and no new trial granted.

OSTRANDER, J., concurred with GRANT, J.

HOOKER, J., did not sit.